COURT OF CHANCERY
OF THE
STATE OF DELAWARE

**LOREN MITCHELL**
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: December 12, 2023
Date Submitted: September 27, 2023

Michael R. Ippoliti, Esquire
Ippoliti Law Group
1225 N. King Street, Suite 900
Wilmington, DE 19801
*Attorney for Denyale Miller*

William J. Rhodunda, Jr. Esquire
Rhodunda, Williams & Kondraschow
1521 Concord Pike, Suite 205
Wilmington, DE 19803
*Attorney for Robert Lilly*

RE: *Denyale M. Miller v. Robert Lilly*,
C.A. No. 2021-0873-LM

Dear Counsel,

This is a petition for partition of real property in Newark, Delaware. While the partition action was pending, the parties agreed to the sale of the property on their own—without assistance from the Court. Before me remains the last stage of the partition proceeding, the distribution of the proceeds from the sale of the property.[1] The parties disagree about how the proceeds of the sale should be distributed. Although a portion of the proceeds have already been distributed to one of the parties, all the proceeds remain at issue for me to apportion.[2] Both parties

---

[1] *Ponder v. Willey*, 2020 WL 6735715, at *1 (Del. Ch. Nov. 17, 2020), report and recommendation adopted, (Del. Ch. 2020).

[2] At the end of trial, counsel for the parties disagreed on whether there was an agreement to distribute at least 50 percent of the proceeds from the sale to the Respondent Lilly.

seek offsets for various payments or improvements. Below I consider those arguments. This is my post-hearing final report.

## I.    Background[3]

On January 19, 2016, the Petitioner, Denayle Miller ("Petitioner or Miller"), and Respondent, Robert Lilly ("Respondent or Lilly"), purchased a home at 205 Stature Drive, Newark, DE 19713 (the "Property"), as joint tenants with the right to survivorship.[4] When they purchased the home, the parties were in a romantic relationship, shared one daughter[5], but were unmarried.[6] Petitioner's mother loaned the parties approximately $6,000 (six thousand dollars) towards the down payment.[7]

The couple lived in the home, as a family, with their daughter and Lilly's son, for about 14 months.[8] While they lived together, the couple agreed that Lilly would be responsible for the mortgage (which included the property taxes and

---

[3] The referenced facts represent the relevant facts, based on my determinations of credibility, used to determine this report as well as my findings based on the relevant submissions, post-trial submission, and the record developed at the September 6, 2023, evidentiary hearing with respect to the division of proceeds from the sale of the home. The procedural history is available in the record. Testimony from the hearing is citied as "[Name] Tr." *See* Tr. of September 6, 2023, Evidentiary Hr'g (Docket item "D.I.". 65).

[4] Compl. (D. I. 1).

[5] Miller Tr. 13:9-10.

[6] Compl. (D. I. 1).

[7] Miller Tr. 13:12-22.

[8] Miller Tr. 17:17-18:9.

homeowner's insurance) and Miller would cover the couple's reoccurring monthly expenses, including monthly streaming accounts, trash collection, utilities (Delmarva and home security) and daycare.[9]  Miller also carried the car insurance for their vehicles at that time.[10]  In  2017, the parties decided to separate, and Miller filed a partition action in this Court on March 9, 2017.[11]  On June 14, 2017, Miller voluntarily dismissed the action without prejudice[12] because she and Lilly agreed to reconcile.[13]  The relationship began to deteriorate, again, in February of 2018.[14] Miller eventually moved out on October 18, 2018.

In May of 2018, while the couple was still intact, the family took a vacation to Puerto Rico.[15]  The vacation was cut short due to a severe storm on the island.[16] When they returned home, they discovered that a tree had fallen on the Property.[17]

---

[9] (Lilly) Tr. at 101.

[10] (Lilly) Tr. at 106.

[11] 2017-0183-MTZ.

[12] D.I. 1; 2017-0183-MTZ.

[13] (Miller) Tr. 19:1-21; (Lilly) Tr. 66:19- 67:5.

[14] (Miller) Tr. 20:22:21.

[15] (Lilly) Tr. 67:9-19.

[16] *Id*.

[17] *Id*.

They immediately sprang into action and contacted the homeowner's insurance.[18]

The tree had damaged both the interior and exterior of the home.[19]  Somehow the

storm also damaged a pipe, causing water to flood the first floor carpeting and hard

wood flooring.[20]  The water also caused flooding in the basement.[21]  The following

day, Lilly resumed the bulk of the repair efforts while Miller returned to work.

Sometime after the property damage occurred, while Lilly was at work, his

son returned home to find that all of Miller's things had been moved out of the home.

Miller testified that in February of that year, Lilly had begun to tell her she needed

to leave and that "he couldn't live like this anymore." Accordingly, she began

preparing to leave. She viewed the Puerto Rico trip as a last-ditch effort to reconcile

and when it didn't work, she left the home.

After Miller left the home, she continued to pay the expenses she previously

paid, but stopped paying Lilly's car insurance and utilities for the Property.[22]  Lilly

continued to exclusively pay the mortgage.  Between March of 2019 and June of

---

[18] *Id.*

[19] (Lilly) Tr. 71:6-20.

[20] (Miller) Tr. 32:13-18.

[21] (Lilly) Tr. 102:23.

[22] *But see* Tr. 17.

2020, neither party paid the mortgage.[23]  Lilly resumed the mortgage payments in July of 2022 after obtaining a loan modification.[24]

On October 11, 2021, Petitioner filed this petition for partition.[25]  After a series of procedural events, this case was reassigned to me following the sale of the Property, on December 14, 2022.[26]  The parties submitted their respective cases regarding the distribution of the proceeds on September 6, 2023, in New Castle County.[27]  The parties requested to supplement their submissions to further support their respective arguments for the apportionment following the hearing.[28]  They were due within three weeks of the hearing.[29] I did not receive a submission for Petitioner Danyale Miller. [30]

---

[23] Tr. 73:2-20.

[24] *Id.*

[25] D.I. 1.

[26] D.I. 23.

[27] D.I. 62.

[28] Tr. 14:1-13.

[29] D.I. 62.

[30] D.I. 64.

## II.  Analysis

### A.  Sale Proceeds in Dispute.

After the Property had been partitioned and sold, the net sum available from the sale was $52,012.41.[31]  Each parties' attorney took approximately one-half, or $26,006.20, and held it in their respective accounts.  Respondent asserts that the parties previously agreed that he was unequivocally entitled to at least 50% of the proceeds of the sale.[32]  As such, and in accordance with that agreement, 50% of the proceeds which his former attorney held were already distributed to him.[33]

Despite the distribution, at trial the parties disagreed on the amount in dispute.[34]  Petitioner's attorney denied any settlement agreement[35] and asserts that 100% of the proceeds remain at issue for distribution by this recommendation.[36]  Although the Respondent included evidence of back-and-forth settlement negotiations in the trial exhibits[37], I decline to take the settlement negotiations into

---

[31] Tr. 80:4-7.

[32] Tr. 141:21-24-Tr. 142.

[33] Tr. 141:21-24-Tr. 142

[34] Tr. 140:17-24.

[35] Tr. 81:1-12.

[36] Tr. 142:12-14:10.

[37] *See* D.I. 14; D.I. 23; D.I. 26 – D.I. 30.

consideration to determine the amount in dispute. Given the clear disconnect between the arrangement of what the parties discussed, and in the interest of equity, this report considers the entire $52,012.41 in dispute. I start under the equitable principal that each co-tenant is entitled to an equal division based on their ownership interest. Therefore, the parties are entitled to split the proceeds equally subject to the specific credits and offsets noted below.

**B.    Petitioner Should Receive Credit for the Loan Used for the Down Payment.**

Petitioner seeks a credit for half of a $6,000.00 loan the parties received from her mother towards the downpayment of the home[38]. She testified that her mother had given them $6,000.00 towards the downpayment of the house under a verbal agreement that they would pay her back.[39] Respondent testified that he believed the money from Petitioner's mother was a gift to them.[40] Petitioner acknowledged that the couple submitted a letter to the mortgage company calling the money a gift, but

---

[38] It is unclear the exact amount of the loan. From the closing disclosure, the amount required to close was just over $6,000, however, when discussed at trial—both parties refer to the loan amount as $6,000. To the extent Petitioner seeks more than $6,000, the request is not properly before the Court and Petitioner has failed to meet her burden.

[39] (Miller) Tr.13:13-14:1.

[40] (Lilly) Tr. 79:17-20.

that both parties knew that her mother expected to be repaid.[41] Petitioner paid her mother back at the end of 2020, or beginning of 2021 without credit from Respondent.[42] I find Petitioner's testimony that the money for the downpayment was a loan from her mother, to be credible. Accordingly, Petitioner shall be credited $3,000.00 from Respondent's share. With both parties starting with $26,006.20 from the sale proceeds, the $3,000.00 credit to the Petitioner makes the new total, $29,006.20 for Petitioner, and $23,006.20 for Respondent.

### C. Respondent Should Receive Credit for the Mortgage, Insurance, and Taxes for the Time he lived in the Property Alone.

Under Delaware law, absent an agreement to the contrary, a cotenant has a duty to pay their proportional share of the carrying cost for the home, even when the other tenant occupies the home exclusively.[43] Here, those costs are the mortgage, homeowners' insurance, and taxes. Neither party submitted a copy of the mortgage statement, but based on testimony and the closing documents submitted, all those costs were included in the monthly mortgage payment.[44]

---

[41] (Miller) Tr. 135:19-136:1; (Miller) Tr. 130:9-131:6.

[42] (Miller) Tr. 130:19-24; Tr. 131:1.

[43] *See Est. of Weber v. Weber*, 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014).

[44] To the extent Miller believed she was paying the homeowners insurance with her USAA auto insurance, she failed to provide a detail statement saying so. Rather, it appeared Miller

Lilly seeks credit from Miller for the payments he made on the mortgage. It is undisputed that Respondent made 100 percent of the mortgage payments from the time they owned the home together, in January 2016, until October 2018.[45] Petitioner acknowledges that Lilly paid the mortgage while she lived in the home but credibly testified that he did so because of their mutual agreement that he would pay the mortgage and she would pay the other reoccurring expenses for the home.[46] Respondent denies that the parties had a formalized agreement regarding the bills, however he acknowledges that he assumed the responsibility of paying 100 percent of the mortgage while the parties lived together.[47] Miller testified that she paid for groceries for everyone in the home (including Lilly's teenage son), the electric bill, Comcast bill, car insurance, and daycare for their daughter while she worked and attended school.[48]

Based on the testimony, I am convinced that the parties had some shared agreement regarding the mortgage for the portion of time they lived together. Lilly

---

lacked an understanding between the differences of hazard insurance, homeowners' insurance, and mortgage insurance (PMI).

[45] (Miller) Tr. 133:2-10.

[46] (Miler) Tr. 14:12-18; (Lilly) Tr. 101:9-24.

[47] (Lilly) Tr. 101:9-24.

[48] (Miler) Tr. 14:12-17:16.

testified that he felt it was his duty to pay the mortgage as a man[49] and Miller testified that she was the primary parent for the children and covering other expenses.[50] Traditional arrangements like this are common and as such, in equity, Lilly should not receive any credit for these carrying costs for the time they lived together and agreed to apportion the household expenses.

When Petitioner left the home, she remained obligated to Respondent for her portion of the mortgage. Lilly stayed in the home alone from October 19, 2018, up to the time the home was sold on December 6, 2022.[51] They lived in the home together between January 2016 and October 2018—when Miller stopped contributing. Lilly should receive credit for the time he lived in the home alone and Petitioner failed to contribute to the mortgage, taxes, and homeowner's insurance. Lilly is entitled to recoupment of the portion of the mortgage Miller was responsible for after she left the home. The Respondent submitted documentation to show $80,203.54 in mortgage payments paid by Lilly between March of 2017 and December of 2022.[52] Miller left the home in the middle of October, after the October

---

[49] (Lilly) Tr. 101:9-102:3.

[50] (Miller) Tr. 16:1-23.

[51] Tr. Exhibit A.

[52] Tr. Exhibit A.

mortgage payment was made. As such, I am only considering mortgage payments Lilly made starting in November of 2018. Between November of 2018 and December 2022, Lilly paid $46,640.66 in mortgage payments for the home.[53] As a cotenant, Miller was responsible to pay half of that cost, or $23,320.33. Thus, the Respondent should be given credit for the $23,320.33 from Petitioner's share of the proceeds. The prior allocation of $29,006.20 for Petitioner will be reduced by $23,320.33, for an updated total of $5,685.70 to Petitioner and $46,326.30 to Respondent.

### D. Respondent Should Not Receive Credit for Repairs and Improvements.

Respondent seeks credits for repairs he made to the Property when a tree fell on the home, and for maintaining the home for the entirety of the party's ownership. Delaware law is clear that living expenses of a cotenant in possession of joint property (including repairs, maintenance, and utilities) need not be shared by the other cotenant(s).[54] Not only were many of respondent's payments reimbursed and compensable by the insurance coverage, to the extent Respondent seeks reimbursement of his out-of-pocket costs, the law does not impose an obligation for

---

[53] *Id*.

[54] *Weber*, 2014 WL 589714 at *5.

credit of repairs. There is no evidence the parties had any agreement that Petitioner was to cover any of the out-of-pocket cost. Importantly, there was no evidence or expert testimony to show that the repairs constituted actual improvements and increased the value of the home at the time it was sold. As such, Respondent is not entitled to a credit for expenses incurred related to repairs and home maintenance.

###    E.    Petitioner Should Not Receive Credits for Childcare.

To the extent Petitioner sought credit or payment for child support arrears, I find that is a separate matter entirely and will not impose credits for child support. Child support payments are not relevant to a partition action.[55] For the time the parties resided in the home together and agreed to cover childcare as a part of the shared expenses, Petitioner's credit has been attributed as mentioned above. Likewise, to the extent Lilly is seeking reimbursement for insurance checks alleged to have been deposited into Miller's account for childcare related expenses, I decline to attribute insurance payments intended for home repairs to Lilly as a part of this report.

---

[55] *Est. of Davis*, 2023 WL 4482223, at *2 (Del. Ch. July 11, 2023).

## III.   Conclusion

For the foregoing reasons, Petitioner is entitled to $5,685.70 and Respondent is entitled to $46,326.30 of the proceeds from the sale of the Property. This represents an initial split of 50% to Petitioner and 50% to Respondent with a $3,000.00 credit to Petitioner for the down payment from Respondent's initial share, and $23,320.33 credit to Respondent for the mortgage payments from Petitioner's share of the proceeds.

This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Loren Mitchell*

Magistrate in Chancery